IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT HUNTINGTON

WALKER KELLY ROWE,

      Plaintiff,


V.                                   CIVIL ACTION NO. 3:04-1246


PRIMECARE MEDICAL OF WEST VIRGINIA, INC.
and LARRY PARSONS,

      Defendants.


**MEMORANDUM ORDER**

In this action, filed under the provisions of 42 U.S.C. § 1983, plaintiff, who was at all relevant times an inmate[1] at the Western Regional Jail, has filed a complaint in which he alleges that, while incarcerated, the defendants, PrimeCare Medical of West Virginia, Inc. ("PrimeCare")[2] and Larry Parsons, the Administrator of the Western Regional Jail, failed to properly attend to his medical needs. There is presently pending before the Court a motion for summary judgment filed by defendants, unverified responses with attachments filed by plaintiff and a reply filed by

---

[1]It appears that plaintiff had been convicted of an offense in state court and was waiting transfer to a state facility at the time of the events giving rise to his complaint. His claims would, accordingly, be analyzed under the "cruel and unusual punishments" clause of the Eighth Amendment. Whether analyzed under the Eighth or Fourteenth Amendment, however, the standard to be applied is the same. Brown v. Harris, 240 F.3d 383, 388 (4th Cir. 2001).

[2]PrimeCare contracts with the State Regional Jail and Correctional Facility Authority to staff the medical departments of the regional jails and would, in the context of a § 1983 action, be deemed a state actor. West v. Atkins, 487 U.S. 42, 54-56 (1988).

defendants. The relevant facts with respect to plaintiff's care are not in dispute and can be summarized as follows:

In his complaint, which is the only verified document filed by plaintiff,[3] he states that on June 24, 2004, he was "involved in a fight" at the jail and injured his hand, which he thought was broken. Sometime thereafter he was seen by a nurse at the jail, presumably a nurse employed by PrimeCare, and x-rays of his right hand, wrist, and shoulder were ordered by Dr. Katiny, a physician contracted by PrimeCare to see inmates at the Western Regional Jail. The x-rays, also dated June 24, 2004, were interpreted as showing "no evidence of fracture" in the right hand or wrist.[4] The following day plaintiff was again seen by a nurse and Motrin 800 mg., to be taken twice a day for ten days, was ordered.[5] Plaintiff was seen by nurses, and on occasion by Dr. Katiny, a number of times between June 25, 2004 and August 16, 2004 for various complaints, including dietary matters, dental problems, back pain, and right hand pain. When he was seen on July 31, 2004 complaining of pain in his right hand, he was observed to be "holding and guarding" his right hand and on August 8, 2004, a nurse observed that his right "dorsal hand" was "bruised, swollen." Prior to the July 31, 2004 visit, plaintiff had been described in notations made by the nurses as without symptoms or without signs or symptoms of "distress." Thereafter, on August 16, 2004, Dr. Katiny ordered additional x-rays of his right hand and prescribed Darvocet N100 twice a day for three

---

[3]A verified complaint is treated as an opposing affidavit for summary judgment purposes. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

[4]A June 28, 2004 report of an x-ray of the right shoulder similarly, indicated a finding of "no fracture or destructive disease."

[5]The medical records submitted with defendant's motion for summary judgment indicate that the order for Motrin was renewed a number of times and was administered, with other medication, during the entirety of the period relative to plaintiff's claims.

weeks. The x-ray, taken the same day, revealed a "[p]robable chronic healing fracture of the index finger metacarpal," a bone in the part of the hand extending between the wrist and the beginning of the index finger.[6]

From August 16, 2004 until November 1, 2004, plaintiff was seen numerous times by nurses at the jail and by Dr. Katiny on at least four occasions with medical complaints ranging from dietary matters to an ear infection and including complaints of pain in his right hand. With the exception of an August 30, 2004 visit, when limited range of motion was noted in his right hand, on almost every occasion plaintiff was observed by the attending nurses to be without signs or symptoms of "distress." On November 1, 2004, plaintiff was taken to Huntington Physical Therapy where he was seen by a physical therapist with complaints of an "incomplete fist, weak grasp and occasional numbness over the volar aspect of the right digits." A report from the therapist, Sally B. Oxley, to Dr. Katiny on that same date indicates that plaintiff was instructed in exercises and given a "home exercise program." Ms. Oxley states in her report that plaintiff would "exercise independently and there is no provision for follow-up." Interestingly, she closes by saying "I will keep you informed of his progress." Subsequently, and continuing beyond the time plaintiff filed his complaint, he was seen frequently by nurses as well as Dr. Katiny, being seen at least once every week and during some weeks on as many of three occasions. He was seen for various matters, including problems with his "nerves," dietary matters, knee pain, dental problems, a testicular cyst, and a possible muscle spasm on his right side, under the arm. On only one occasion in the sick call requests was his right hand mentioned, this being on December 31, 2004 when he asked to be placed on the "doctor's list for [his] right hand and diet and medication change." He was seen by Dr. Katiny on

---

[6]_Attorneys' Dictionary of Medicine_, M-158 (2007).

January 4, 2005; however, Dr. Katiny's notes principally concern knee problems and diet, with no mention of the right hand. In the interim, in November of 2004, plaintiff filed requests and grievances in which he sought a follow-up visit at Huntington Physical Therapy, asserting that the "physical therapy therapist said that she needed to have follow-up every two weeks ... ." In each instance, the response, ultimately from medical personnel, was that only a "one time" appointment had been made and that the physical therapist had shown plaintiff exercises which he was to do on his own at the Western Regional Jail. As has been seen, the physical therapist involved had advised Dr. Katiny that plaintiff would "exercise independently" and that there was "no provision for follow-up;" however, her statement that she would keep Dr. Katiny "informed of his progress," does create some ambiguity with respect to her recommendations for plaintiff's care.

In evaluating plaintiff's claims the Court notes, as an initial matter, that there is no apparent basis in the complaint or in the record of this case for asserting liability against PrimeCare or Larry Parsons. With respect to plaintiff's claims against PrimeCare, while it has long been settled that "persons" subject to liability under § 1983 include legal as well as natural persons, Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 690 (1978), nevertheless, decisions such as Monell have not altered the established rule that "the doctrine of respondeat superior is not a basis for rendering [such entities] liable under § 1983 for the constitutional torts of their employees." Id. at 663-64 n. 7. Nothing alleged in the complaint indicates that acts of a policymaking official or an "official policy or custom" of PrimeCare bore any causal relation to plaintiff's medical care, and it is apparent that liability with respect to PrimeCare is, in fact, premised on the doctrine of respondeat superior. In the absence of any basis for concluding that

4

PrimeCare's involvement extends beyond the fact that it employed health care workers who treated plaintiff, however, no basis for liability is established.

With regard to plaintiff's claims against Larry Parsons, recognizing, as was the case with respect to PrimeCare, that liability cannot be premised on respondeat superior and that "'[l]liablity will only lie where it is affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights,'" Vinnedge v. Gibbs, 550 F.2d 926, 928 (4th Cir. 1977), the Court perceives no basis for asserting a claim against the administrator of the regional jail. He is not mentioned in the complaint, and insofar as his employees were involved in plaintiff's medical care, their involvement was limited to referring plaintiff's requests and grievances to the "medical administrator" or to a nurse. Prison officials are, however, "entitled to rely upon their health care providers' expertise,"[7] and, absent any evidence of a tacit authorization to "employ grossly incompetent medical procedure[s]," id. at 855, such officials fulfill their duty by taking reasonable steps to ensure that an inmate's medical complaints or concerns are brought to the attention of a health care provider. Employees at the Western Regional Jail were doing precisely this, and, as a consequence, plaintiff's claim against the jail administrator is without merit.

Beyond questions concerning defendants' involvement in the deprivations complained of, it is also apparent that plaintiff's claims of inadequate medical care fail to establish any basis for liability under § 1983. Plaintiff's status as a convicted prisoner mandates "scrutiny" of his treatment under Eighth Amendment standards. Hutto v. Finney, 437 U.S. 678, 685 (1978), and evaluation of defendants' conduct in light of that amendment's prohibition of "cruel and unusual punishments." Analysis begins with Estelle v. Gamble, 429 U.S. 97 (1976), a case involving claims of denial of

---

[7]See Miltier v. Beorn, 896 F.2d 848, 854-55 (4th Cir. 1990).

medical care by a convicted prisoner. Noting that "evolving standards of decency" require the state to "provide medical care for those whom it is punishing by incarceration," the standard prescribed by the Court for evaluating claims involving medical care is one of "deliberate indifference to a prisoner's serious illness or injury," and "[i]n order to state a cognizable claim, a prisoner must allege acts or omission sufficiently harmful to evidence deliberate indifference to serious medical needs." Id. at 102-06. Estelle's standard – "deliberate indifference to serious medical needs" – contains both an objective element and a subjective element. The objective element, derived from the requirement of a serious medical need, requires that an inmate's medical needs "must be objectively, 'sufficiently serious'" Farmer v. Brennan, 511 U.S. 825, 834 (1994), while the subjective element, derived from the requirement that an inmate establish deliberate indifference, "entails something more than mere negligence" and "is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Id. at 835. "It requires that a prison official know of and disregard the objectively serious condition, medical need, or risk of harm." Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995).

"Deliberate indifference is a very high standard," Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999), and medical malpractice or negligence "in diagnosing or treating a medical condition," even if established, will not support a claim of "medical mistreatment." Estelle v. Gamble, supra. at 106. Rather, to establish a constitutional violation under Estelle's standard, the treatment, or lack of treatment, "must be so grossly incompetent, inadequate or excessive as to shock the conscious or to be intolerable to fundamental fairness." Miltier v. Beorn, supra. at 851.

It would appear, and is assumed for purposes of decision, that the injury to plaintiff's hand involved a serious medical condition, and, as a consequence, the objective component of an Eighth

6

Amendment prima facia case is established. With respect to the subjective component, however, the evidence before the Court establishes what, at most, might be characterized as negligence. Thus, while it may be that the initial x-ray of plaintiff's right wrist and hand was misread, nothing supports the view, and plaintiff has not asserted, that this misreading could be characterized as anything other than medical malpractice or negligence.[8] As for plaintiff's claim that he was denied physical therapy which had been prescribed, his medical providers were clearly entitled to rely on the therapist's directions for a "home exercise program" with "no provision for follow-up." Beyond this, the undisputed evidence establishes that plaintiff's complaints were attended to and he was seen within a relatively short periods of time on every occasion that he submitted a sick call request. Whether the treatment administered was always medically appropriate treatment is not the issue, for negligence "in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment," Estelle v. Gamble, supra. at 106, and "[q]uestions of medical judgment are not subject to judicial review." Russell v. Sheffer, 528 F.2d 318, 319 (4th Cir. 1975).

Viewing the evidence in the light most favorable to plaintiff, it is, nevertheless, apparent that plaintiff has premised liability on the part of the defendants on the theory of vicarious liability and that, while plaintiff's medical condition is serious, the evidence presented simply does not demonstrate deliberate indifference in the treatment of the healing fracture of his index finger metacarpal. There is, as a consequence, an absence of "concrete evidence from which a reasonable juror could return a verdict in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

---

[8]Defendants' assert, and plaintiff does not dispute, that the pre-filing requirements of W. Va. Code § 55-7B-6 have not been satisfied.

Based on the foregoing, the Court will grant the motion of the defendants for summary judgment and dismiss this action, and it is so **ORDERED**.

The Clerk is directed to transmit a copy of this Memorandum Order to plaintiff and all counsel of record.

ENTER:        September 21, 2009

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE